[Cite as *State v. Jackson*, 2024-Ohio-958.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                          No. 112949

    v.                                    :

STANLEY JACKSON,                        :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 14, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-676089-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Chauncey Keller and Ryan Bokoch, Assistant Prosecuting Attorneys, *for appellee.*

Scott J. Friedman, *for appellant.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant, Stanley Jackson, appeals his convictions on 34 counts arising from three incidents, following a jury trial. He contends that the trial court committed plain error by failing to sever, for trial, the charges relating to each

incident; that he was denied the effective assistance of counsel because his trial counsel failed to request severance of the charges and that the trial court erred in imposing sentences on firearm specifications attached to three having weapons while under disability charges because the state failed to present evidence of the date Jackson was released from prison or completed postrelease control on a prior offense. For the reasons that follow, we affirm.

## I. Factual Background and Procedural History

{¶ 2} On November 16, 2022, a Cuyahoga County Grand Jury indicted Jackson on 34 counts: five counts of aggravated robbery, 11 counts of kidnapping, one count of grand theft, three counts of having weapons while under disability, one count of carrying a concealed weapon, two counts of disrupting public services, one count of arson, two counts of improperly handling firearms in a motor vehicle, seven counts of rape and one count of aggravated arson. Many of the counts included specifications, including firearm specifications, repeat violent offender specifications, sexual motivation specifications, sexually violent predator specifications, notice of prior conviction specifications and forfeiture of weapon specifications. The charges arose from three incidents that allegedly occurred on May 24, 2022, June 1-2, 2022 and July 28, 2022. Jackson pled not guilty to all charges and the case proceeded to trial.

{¶ 3} Jackson waived his right to a jury trial on the having weapons while under disability charges, the notice of prior conviction specifications, the repeat violent offender specifications, the sexual motivation specifications, the sexually

violent predator specifications and the 18-month and 54-month firearm specifications. The remaining charges were tried to a jury. A brief summary of facts relevant to this appeal, as presented at trial, follows.

## A. May 24, 2022 Incident

{¶ 4} On the evening of May 23, 2022, A.A. picked up a friend, D.M., in her 2008 Honda CRV and drove to the parking lot of Charles Dickens Elementary School in Cleveland. A.A. testified[1] that she and D.M. sat in the car, listening to music and looking up at the stars, until the early morning hours of May 24, 2022. While they were in the car, a black male wearing a mask and black clothing tapped on the window with a gun. The man ordered A.A. and D.M. out of the car. They complied. The man demanded money. They told him they had none. He then put on gloves, took their cell phones out of the car and smashed them on the ground. Pointing the gun at the couple, he ordered them to take off their clothes and shoes and then walk while he followed them in A.A.'s vehicle. Again, they complied. After they walked for approximately one block, the man drove away in A.A.'s vehicle.

{¶ 5} After the man drove off, A.A. and D.M walked back to the school, attempting to retrieve their clothing. They discovered the man had taken their clothing but had left their shoes. They put on their shoes and walked to the home of a friend of D.M. A.A. then called her mother, who picked her up and took her home, and called the police. A.A. stated that she could not identify her assailant.

---

[1] D.M. did not testify at trial.

{¶ 6} A.A. testified that a few days after the incident, while she was on a break at work, she saw someone driving her car on Euclid Avenue in Cleveland and notified police. A few weeks later, her car was recovered by police, undriveable and unrepairable, with fire damage. A.A. testified that she did not know anyone named Stanley Jackson and that there was no reason why his DNA or anything belonging to him should be in her car.

## B. June 1-2, 2022 Incident

{¶ 7} On the evening of June 1, 2022, B.T. and her then four-year-old son, D.T., accompanied B.T.'s friend, N.D., while N.D. delivered food for Door Dash. B.T. and N.D. testified that around 11 p.m. on June 1, 2022 or midnight on June 2, 2022, N.D. drove her car, a white 2012 Lincoln MZK, to a secluded parking lot near Kinsman Road in Cleveland, and B.T. and N.D. exited the vehicle to go to the bathroom while D.T. remained in the backseat of the car, asleep. While the women were out of the car, a masked, dark-skinned black male with a gun approached them and ordered them to get into the car. The man (whom B.T. later identified as Jackson) was wearing a black mask, black clothing, white or clear plastic gloves and dingy white shoes. The women complied with that demand. N.D. sat in the driver's seat, B.T. sat in the front passenger seat and Jackson sat in the backseat with B.T.'s son.

{¶ 8} B.T. and N.D. testified that Jackson ordered the women to give him their phones and demanded cash. N.D. testified that she gave him the $20 or $30 in cash she had, but B.T. had only a bank card, so he ordered N.D. to drive to several

ATMs in order that B.T. could withdraw cash from her accounts using her bank card. As they traveled in the vehicle, Jackson kept his gun pointed at B.T. B.T. testified that she withdrew approximately $900 in multiple transactions, which she gave to the Jackson. At one point, Jackson fired the gun out the car window, causing the women to scream. Jackson then ordered N.D. to drive to an empty field near East 116th Street and Kinsman, ordered the women to get out of the car and to walk toward the field, following behind them with the gun in his hand. The women complied. D.T. remained in the back seat of the car, pretending to be asleep.

{¶ 9} B.T. and N.D. testified that once they were in the field, Jackson ordered them, at gun point, to take off their clothes. He then ordered them to perform oral sex on one another, and he raped both women, twice. B.T. testified that, at first, Jackson was wearing a condom, but he later removed it. At all times, the gun was next to Jackson, within his reach. After raping the women, Jackson walked to another car, a small bluish-grey SUV (later identified as the vehicle that had been stolen from A.A.), that was parked nearby and he retrieved a can of gasoline or lighter fluid. B.T. screamed and begged Jackson to allow her to get her son out of the car. After several minutes, Jackson told B.T. to pick up the clothing they had removed, bring it to N.D.'s car and get D.T. out of the car. She did so. Jackson then ordered N.D., B.T. and D.T. back to the field. He poured gasoline or lighter fluid on N.D.'s car and ignited it with a lighter, setting N.D.'s car on fire.

{¶ 10} After Jackson drove away in the SUV, B.T., D.T., and N.D. ran to a house next to the field where N.D.'s "auntie" lived. The woman allowed them entry,

provided clothing to the naked women and allowed B.T. use her phone to call her mother and 911. Police, fire and EMS responded and the women were taken to the hospital where sexual assault examinations were performed on B.T. and N.D.

{¶ 11} Neither B.T. nor N.D. identified Jackson in a photo array as the perpetrator. However, B.T. identified Jackson in court as the man who had robbed and assaulted them. B.T. testified that she had seen Jackson earlier that evening — before they pulled into the parking lot to go to the bathroom—walking on the sidewalk along Kinsman Road. At that time, he was not wearing a mask. N.D. testified that she had also seen the man earlier that evening, i.e., he had walked past the car when she was stopped at a stop sign on the corner of East 117th Street and Kinsman Road. She stated that she noticed the man because "he looked weird," wearing a mask and gloves when "[i]t was nice outside." N.D. testified that she did not see his full face, just his eyes and lips. The women did not know Jackson and had never seen him before that evening.

## C. July 28, 2022 Incident

{¶ 12} During the evening hours of July 27, 2022, K.C. went out to dinner and then to a bar. K.C. testified that at approximately 2:00 a.m., she left the bar and drove toward East 93rd Street and Kinsman Road to pick up her child from the babysitter. As she was driving, she realized she was tired and "a bit overintoxicated," so she pulled over to the side of the road on East 143rd Street, with her car windows "cracked open," to "rest [her] eyes for a second." While she was on the phone with a friend, she dozed off. She awoke to a man (later identified as Jackson) entering

her car through the front passenger-side door with a gun. He had accessed the car, a black Q8 Audi, through the cracked-open window. She stated that Jackson wore a blue "COVID-19" medical mask, black or dark clothing and blue medical gloves.

{¶ 13} K.C. testified that Jackson sat in the front passenger seat, took her bank card from her purse and ordered her, at gunpoint, to drive to an ATM. She complied. She withdrew $500 from her account, her ATM daily limit, and gave it to Jackson.

{¶ 14} K.C. testified that Jackson ordered her to continue driving and ultimately told her to stop the car and park. He spoke to her about his children and about how she looked and was dressed. Jackson then ordered K.C. to get into the backseat of the car and remove her clothes. When K.C. told Jackson he did not have to do this, he fired the gun and shot out her sunroof. Jackson raped her in the car. K.C. stated that, at first, Jackson took a glove off and put it on his penis, but later removed it as he raped her. K.C. then "blacked out a little bit."

{¶ 15} K.C. testified that after Jackson raped her, he rubbed her vagina with a car-cleaning cloth that had been in her vehicle, then sprayed air freshener on surfaces he had touched and wiped them down with the cloth. K.C. got back into the driver's seat and Jackson ordered her to look straight ahead. K.C. complied. K.C. continued looking straight ahead as Jackson left the car. K.C. grabbed her phone to take a picture of where she was, i.e., East 116th Street and Union Avenue in Cleveland, then drove to the nearest location where there were other people at a gas station and called police. K.C. stated after he left the car, she saw Jackson on the

side of the road, riding a bike. Police and EMS responded, and K.C. was taken to the hospital where a sexual assault examination was performed. K.C. identified Jackson in court as the man who had robbed and assaulted her. She stated that even though he was wearing a mask, she could tell he was bald from "touching on him," that he had facial hair "from the puffiness from his mask" and that she remembered his tired "[b]rown dark eyes." She said, "I made sure I got a good look if he was going to kill me that day." K.C. testified that she did not know Jackson and that there would be no reason why his DNA would be on anything associated with her or her car.

{¶ 16} In addition to the victims, the state presented testimony from N.D.'s "auntie," responding police officers, a fire investigator, nurses who performed the sexual assault examinations of B.T., N.D. and K.C. and police officers and detectives who were involved in investigating the incidents, recovering and securing evidence and/or arresting Jackson. The state also introduced, among other things, surveillance footage capturing portions of the incidents, photographs of the scenes of the incidents and the vehicles involved, the sexual assault examination kits and medical records, items recovered from the scenes of the incidents, from A.A.'s vehicle and lab reports documenting the results of forensic analysis.

### D. Items Recovered from A.A.'s Vehicle

{¶ 17} A.A.'s vehicle, a 2008 Honda CRV, was recovered by police on June 16, 2022, after it had been burnt and abandoned. When the vehicle was processed, police found several items in the vehicle that were ultimately linked to Jackson, including a cigarette butt, a latex glove, a pair of jeans and a Taco Bell employee

timecard receipt. The employee timecard receipt was dated May 28-29, 2022, had the name "Stanley Jackson" on it and included a store number associated with the Taco Bell Cantina at Public Square in Cleveland. Police contacted the restaurant and learned that Jackson had been employed there. Jackson was later arrested at the restaurant when a detective, pretending to be a manager of the restaurant, contacted Jackson and made arrangements with him to pick up a final "paycheck" at the restaurant.

### E. DNA Evidence

{¶ 18} The state presented evidence that Jackson's DNA profile matched DNA found on the latex glove recovered from A.A.'s stolen vehicle that was three nonillion times (outer surface of the glove) and 563 octillion times (interior surface of the glove) more probable than a coincidental match to an unrelated African-American person and matched DNA found on the cigarette butt recovered from A.A.'s stolen vehicle that was 349 billion times more probable than a coincidental match to an unrelated African-American person.

{¶ 19} The state presented evidence that Jackson's DNA profile matched DNA found in two samples collected as part of B.T.'s sexual assault kit that were 168,000 times and 1.19 billion times more probable than a coincidental match to an unrelated African-American person and matched DNA found in the sperm fraction of vaginal swabs collected in K.C.'s sexual assault kit that was 2.49 nonillion times more probable than a coincidental match to an unrelated African-American person.

### F. Jackson's Testimony

{¶ 20} Jackson testified in his defense. He denied committing any of the acts of which he was accused relating to the May 24, 2022 incident, including forcing A.A. and D.M. to undress, taking their cell phones, stealing A.A.'s vehicle or setting fire to the vehicle. As a possible explanation for the presence of his DNA or items belonging to him in A.A.'s stolen vehicle, Jackson claimed that his cousins had driven similar vehicles and that he had previously ridden in one of their cars. Jackson testified that the timecard receipt from Taco Bell and the latex glove containing his DNA must have fallen out of his pocket when he reached for his wallet to pay the driver for giving him a ride to or from work. Jackson acknowledged that the jeans which police had recovered from A.A.'s vehicle belonged to him, but he claimed that he had given them to his cousin.

{¶ 21} Jackson likewise denied kidnapping B.T., N.D. or K.C. at gunpoint, sexually assaulting them or setting fire to N.D.'s car. Jackson admitted to having had sex with B.T. and K.C. (but not N.D.) and claimed that he had met the women through an escort app or website, that he had paid them for sex and that the sex was consensual. Jackson stated that the women had fabricated the rape charges after a dispute arose regarding payment.

{¶ 22} The jury returned guilty verdicts on all charges tried to the jury. The trial court returned guilty verdicts on all charges and specifications tried to the bench. In June 2023, the trial court sentenced Jackson to an aggregate prison term

of 376.5 years to life.  Jackson was also designated a violent offender, arson offender and a Tier III sex offender.

{¶ 23} Jackson appealed, raising the following three assignments of error for review:

> Assignment of Error 1: The trial court committed plain error when it failed to order separate trials.
>
> Assignment of Error 2: The Appellant was denied the effective assistance of counsel, in derogation of his rights under the Sixth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.
>
> Assignment of Error 3: The trial court erred when it imposed a prison sentence for firearm specifications for a violation of R.C. 2923.13, having a weapon under disability.

## II.  Law and Analysis

### A.  Failure to Sever the Charges

{¶ 24} In his first assignment of error, Jackson argues that the trial court committed plain error in failing to, sua sponte, sever the charges relating to each of the three incidents for trial.

{¶ 25} Crim.R. 8(A) governs the joinder of offenses in a single indictment. Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶ 26} The law favors joining multiple offenses in a single trial if the requirements of Crim.R. 8(A) are satisfied.  *State v. Lott*, 51 Ohio St.3d 160, 163, 555

N.E.2d 293 (1990). "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992), citing *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981), and 2 LaFave & Israel, *Criminal Procedure*, Section 17.1, 354-355 (1984). And "[i]n some circumstances, "'the defendant may prefer the disadvantages of joinder to the harassment, delay, trauma, and expense of multiple prosecutions.'" *Schaim* at 58, quoting *Torres* at 355, quoting 2 *ABA Standards for Criminal Justice,* Section 13-2.1, 13.14 (2d Ed.1980).

{¶ 27} Crim.R. 14, however, requires separate trials when it appears joinder would result in prejudice. The rule states, in relevant part: "If it appears that a defendant or the state is prejudiced by a joinder of offenses * * * in an indictment * * *, the court shall order an election or separate trial of counts * * * or provide such other relief as justice requires." "Severance may be warranted if the trial court finds a serious risk that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence." *State v. Jackson*, 8th Dist. Cuyahoga No. 102394, 2015-Ohio-4274, ¶ 12, citing *United States v. Zafiro*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *see also State v. Williams*, 8th Dist. Cuyahoga No. 112481, 2024-Ohio-337, ¶ 16 ("Generally, joinder is disfavored where the jury could potentially confuse the issues and the facts essential to the elements of the distinct crimes."). Under Crim.R. 12, a request for severance under Crim.R. 14 must be raised before trial. Crim.R. 12(C)(5), (H)

{¶ 28} It is the defendant's burden to affirmatively demonstrate that joinder is prejudicial. *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 21, quoting *Torres* at syllabus; *State v. Woods*, 8th Dist. Cuyahoga Nos. 112579 and 112580, 2024-Ohio-467, ¶ 25. The defendant has "'the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.'" *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 62, quoting *Torres* at 343. "But even if the equities appear to support severance, the state can overcome a defendant's claim of prejudicial joinder" by showing either that (1) it could have introduced evidence of the joined offenses as other-acts evidence under Evid.R. 404(B) (the "other acts test") or (2) the "'evidence of each crime joined at trial is simple and direct'" (the "simple and direct test" or "joinder test"). *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 104, quoting *Lott* at 163; *see also Schaim* at 59 ("When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct.").

### 1. Standard of Review

{¶ 29} Ordinarily, an appellate court reviews a denial of severance under Crim.R. 14 for abuse of discretion. *Spaulding* at ¶ 63, citing *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166. Where, as here, however, the defendant did not object to joinder and did not file a Crim.R. 14 motion for severance

in the trial court, we review a claim of prejudicial joinder for plain error. *Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, at ¶ 22; *Lott*, 51 Ohio St.3d at 164, 555 N.E.2d 293; *State v. Miller*, 8th Dist. Cuyahoga No. 111785, 2023-Ohio-1141, ¶ 83; *see also Woods* at ¶ 27 ("If a defendant fails to timely file his or her motion [under Crim.R. 14], the right to severance of a trial is deemed waived."), citing *State v. Day*, 8th Dist. Cuyahoga No. 108435, 2020-Ohio-5259, ¶ 69, citing *State v. O'Neal*, 6th Dist. Lucas No. L-92-279, 1993 Ohio App. LEXIS 3864, 2 (Aug. 6, 1993); Crim.R. 12(H) ("Failure by the defendant to raise defenses or objections or to make requests that must be made prior to trial * * * shall constitute waiver of the defenses or objections * * *.").

{¶ 30} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error is an obvious error or defect in the trial court proceedings that affects a substantial right. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Reversal for plain error requires a showing that there was an error, that the error was obvious and that "there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis deleted.) *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 66, quoting *Rogers* at ¶ 22. The party asserting plain error "bears the burden of proof to demonstrate plain error on the record." *Rogers* at ¶ 22, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. An appellate court notices plain error "'with the utmost caution, under

exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 31} Jackson argues that the offenses relating to each incident should have been severed for trial because (1) the case involved "three separate incidents involving different victims," (2) Evid.R. 404(B) and R.C. 2907.02(D) would have "prohibited evidence of all three incidents" if there had been separate trials and (3) "the evidence was not simple and direct" and "tended to blur together, due to the similarity of the allegations."

{¶ 32} The state responds that Jackson's convictions should be affirmed because Jackson "fails to assert his claim through the appropriate standard of review" and, thereby, "fails to articulate a viable basis for relief." The state further asserts that joinder of the offenses was proper because (1) the other-acts evidence was admissible under Evid.R. 404(B) as evidence of modus operandi, as evidence of a common scheme or plan or to refute Jackson's claim that he did not rape B.T., N.D. and K.C. and (2) the state's evidence was simple and direct.

## 2. Admissibility of Evidence as Other-Acts Evidence

{¶ 33} Pursuant to Evid.R. 404(B)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."[2] In general,

---

[2] Jackson also claims that evidence of the other incidents would have been inadmissible under R.C. 2907.02(D). That provision states, in relevant part:

"[e]vidence that [a defendant] committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad character." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15. However, evidence of other crimes, wrongs, or acts may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2).

{¶ 34} "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts. Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence

> Evidence of specific instances of the defendant's sexual activity * * * shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or sexually transmitted disease or infection, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

However, Jackson concedes that "[t]he rules of evidence and R.C. 2945.59 provide exceptions to this rule, and allow the admission of 'other acts' evidence to prove motive, opportunity, intent preparation, plan, knowledge, identity, or absence of mistake or accident." (Appellant's Br. at 11.) R.C. 2945.59 states:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

Accordingly, we do not further address R.C. 2907.02(D) here.

of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22.

{¶ 35} For other-acts evidence to be admissible: (1) the other-acts evidence must be relevant under Evid.R. 401; (2) the other-acts evidence must be introduced for a purpose other than proving propensity, such as one or more of the permitted purposes set forth in Evid.R. 404(B)(2) and (3) the probative value of the other-acts evidence must not be substantially outweighed by the risk of unfair prejudice, confusion of the issues or misleading the jury under Evid.R. 403(A). *Hartman* at ¶ 24-29; *Williams* at ¶ 19-20; *Miller*, 2023-Ohio-1141, at ¶ 88.

{¶ 36} Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. In the Evid.R. 404(B) context, however, "the inquiry is not whether the other-acts evidence is relevant to the ultimate determination of guilt." *Hartman* at ¶ 26. The proffered evidence must relevant to a legitimate nonpropensity purpose and the nonpropensity purpose for which the evidence is offered "must go to a 'material' issue that is actually in dispute between the parties." *Id.* at ¶ 26-27; *see also State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 37 ("[T]he relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute.").

{¶ 37} Courts are precluded from admitting improper character evidence under Evid.R. 404(B) but have discretion to admit other-acts evidence that is admissible for a permissible purpose. *Hartman* at ¶ 22, citing *Williams* at ¶ 17; *Miller* at ¶ 89.

### 3. Simple and Direct Evidence

{¶ 38} Evidence is "simple and direct" if the trier of fact is capable of segregating the proof required for each offense. *State v. Belle*, 8th Dist. Cuyahoga Nos. 107046 and 107300, 2019-Ohio-787, ¶ 25, citing *State v. Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379, 937 N.E.2d 136, ¶ 39 (10th Dist.). The object of the "simple and direct" test is to prevent the jury from improperly considering evidence of various crimes as corroborative of one another. *State v. Echols*, 128 Ohio App.3d 677, 694, 716 N.E.2d 728 (1st Dist.1998). "'"The very essence of the rule is that the evidence be such that the jury is unlikely to be confused by it or misuse it."'" *State v. Abudu*, 8th Dist. Cuyahoga No. 111837, 2023-Ohio-2294, ¶ 29, quoting *Echols,* 128 Ohio App.3d at 694, 716 N.E.2d 728, quoting *Drew v. United States*, 331 F.2d 85, 93 (D.C.Cir.1964). "'Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof.'" *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 16, quoting *State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224 and L-09-1225, 2010-Ohio-4202, ¶ 33.

## 4. Jackson's Arguments Relating to Severance

{¶ 39} In support of his claim that the trial court erred in failing to sever the offenses and hold separate trials on the offenses relating to each incident, Jackson relies on three cases, which he claims contain "a fact pattern similar to the one in this case": *State v. Quinones*, 11th Dist. Lake No. 2003-L-015, 2005-Ohio-6576; *State v. Frazier*, 8th Dist. Cuyahoga No. 83024, 2004-Ohio-1121; and *Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661. These cases are readily distinguishable from this case.

{¶ 40} In *Quinones*, the defendant was convicted of four counts of gross sexual imposition. *Quinones* at ¶ 1. The charges arose from allegations of improper sexual contact between the defendant and his nine-year-old granddaughter during 1999-2000 and allegations of sexual conduct and sexual contact with the eight-year-old daughter of a previous girlfriend during 2000-2001. *Id.* at ¶ 2-5, 8-9. The Eleventh District held that the trial court had committed plain error when it failed to hold separate trials on the offenses relating to each victim based on prejudicial joinder. *Id.* at ¶ 47, 55. The court determined that evidence of the other child's allegations of abuse, "which occurred at a wholly different time period and involved a separate set of circumstances," would not have been admissible if the offenses relating to each victim had been tried separately because there was "no distinct pattern of abuse or relationship to the offenses that would permit the overlapping of the evidence." *Id.* at ¶ 47.

{¶ 41} The court also found that the evidence relating to the two victims was not "simple and direct."  The court indicated that because both child victims alleged that the defendant "inappropriately touched them on their 'private parts'" and both described an incident that took place on a couch, while watching television or a movie, the jury could "readily confuse" the evidence related to one child's allegations with that of the other and "consider[] evidence of each child's accusations as corroborative of the other."  *Id.* at ¶ 48-49.  The court also determined that the manner in which the state presented its witnesses, i.e., the "continual change of attention" between the two victims' allegations against the defendant, "further mingled the evidence in the case," "creat[ing] an extremely difficult task, at best, for the jury to keep the allegations separate when rendering the verdicts."  *Id.* at ¶ 50. That is not the situation here.

{¶ 42} *Frazier*, 2004-Ohio-1121, which was not a plain error case, also involved sex crimes against young children.  In that case, the defendant was indicted in two separate cases and charged with sex-related offenses against two young relatives, who were 8 and 11 at the time of the alleged offenses.  *Id.* at ¶ 2-3.  Over the defendant's objection, the trial court granted the state's motion to join the two indictments, and the case proceeded to a jury trial.  *Id.* at ¶ 4.

{¶ 43} The first victim testified that, during two separate incidents in 1996, the defendant grabbed her arm, put her in his room, pushed her on his bed and raped her when she went to his apartment on errands for her grandmother.  *Id.* at ¶ 5.   The second victim also testified regarding two incidents involving the

defendant. She testified that in December 2001, while she was watching television at the defendant's house, the defendant "put [her] on the wall" and put his hand underneath her shirt "going towards [her] chest." *Id.* at ¶ 6. She testified that in January 2002, the defendant came to her apartment and that, while she was sitting on the couch watching television, the defendant sat next to her, grabbed her arm, put his hand on her knee in an attempt to separate them, and said, "Let's do it." *Id.* She indicated that she refused, pushed the defendant away and told him to leave the apartment, which he did. *Id.*

{¶ 44} As to first victim, the jury found the defendant guilty of two counts of kidnapping, two counts of rape and two counts of gross sexual imposition. *Id.* at ¶ 8. As to the second victim, the jury found the defendant guilty of kidnapping, attempted gross sexual imposition and attempted rape. *Id.* On appeal, this court reversed and remanded the case for new, separate trials for each victim. *Id.* at ¶ 22.

{¶ 45} With respect to whether the defendant's other acts would have been admissible if the offenses against each victim been tried separately, the opinion — as to which two of the three panel members concurred in judgement only — stated that the second victim's testimony regarding the defendant's sexual conduct towards her would not have been admissible to prove that the defendant raped the first victim because "[w]hat happened between [the defendant and the second victim] was not relevant to the rape charge involving [the first victim]." *Id.* at ¶ 16. The opinion acknowledged that "[a]s pertains to the testimony of [the first victim] regarding the offenses involving [the first victim], evidence that [the defendant]

exhibited a pattern of isolating young relatives for the purpose of sexual gratification may be admissible" but that "[e]ven if appropriately limited, * * * any testimony regarding the rape of [the first victim] would be inadmissible because the prejudice to [the defendant] would outweigh its probative value." *Id.*

{¶ 46} With respect to whether "a finding of prejudice [was] precluded" because the evidence was "simple and distinct," the opinion stated:

> We make no such finding. * * * [T]he offenses in this case are highly inflammatory in nature. Sexually-related offenses elicit emotional outrage, even more so when those offenses involve children. This, combined with the fact that the offenses against each victim varied in degree and that the testimony by each victim was similar, the fact-finder would have had a very difficult time looking at the evidence supporting each offense as simple and distinct because the temptation would be too great to respond to the evidence emotionally rather than rationally.

*Id.* at ¶ 17-18.

{¶ 47} The opinion concluded that the first victim's testimony prejudiced the defendant because the second victim's testimony was not sufficient to demonstrate a "substantial step" toward rape, as required for a conviction for attempted rape. *Id.* at ¶ 19. The opinion explained:

> Notwithstanding that the trial court ignored the law regarding attempted rape, the jury most likely would not have convicted appellant for this offense involving Victim II but for the otherwise inadmissible testimony regarding the rape of Victim I. Victim I's testimony was that appellant was seated next to her on a sofa, put his hand on her knee, grabbed her arm and said, "Let's do it." When Victim II refused, she pushed away from appellant and he left the apartment. On this evidence, there could be no "substantial step" toward rape as is required to support a conviction for attempted rape.* * * Had these offenses against each of the victims been tried separately and evidence of other acts appropriately limited, it is unlikely that appellant would have been convicted of attempted rape. Instead, the jury heard the

> details of the evidence supporting the charges of rape involving Victim
> I, and most likely, concluded that appellant had the propensity to
> commit the same crime against Victim II on evidence that would
> otherwise be insufficient to support a conviction for attempted rape.

*Id.* at ¶ 19. This is not that case. *See also State v. Woodruff*, 1st Dist. Hamilton Nos. C-140256 and C-140257, 2015-Ohio-2422, ¶ 14 (finding "the logic of *Frazier* to be flawed" and "declin[ing] to follow it," stating: "As we understand the second part of the joinder test, the focus is not on the emotional impact of the evidence but on the potential for juror confusion. We cannot presume that just because evidence may garner a strong emotional response that jurors are incapable of segregating the evidence in their minds. To accept the logic of *Frazier* would mean that sex counts could rarely be joined, because the evidence will often be inflammatory. Instead we believe the same rules on joinder should apply in sex cases as in any other case.")

{¶ 48} In *Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 — also not a plain error case — a single indictment charged the defendant with sexual offenses against three different victims, i.e., two counts of forcible rape involving the defendant's 20-year-old adopted daughter, one count of gross sexual imposition involving the defendant's young, minor daughter and two counts of sexual imposition involving an adult employee. *Id.* at 52. The trial court denied the defendant's motion to sever the case into three different trials, each involving the charges against a single victim. *Id.* at ¶ 54, 58.

{¶ 49} The adult daughter testified that the defendant had subjected her to a pattern of sexual abuse that began when she was a preteen, that her father regularly

gave her back rubs, which became a prelude to sexual fondling when she was ten or eleven years old and which thereafter escalated to a variety of sexual acts. The adult daughter testified that her father had vaginal intercourse with her twice when she was 20 and that she did not consent but that, based on her history with him, she "felt like if [she] didn't do it, [she] would be punished for it." *Id.* at 52.

{¶ 50} The defendant's minor daughter testified that her father regularly gave her backrubs and that, on one occasion, he touched her buttock underneath her underwear during a backrub. *Id.* at 53. The defendant's employee testified that the defendant had, on two occasions, put his hand under her blouse and attempted to put his hand under her bra. *Id.*

{¶ 51} Following a jury trial, the defendant was convicted of the forcible rape of his adult daughter and gross sexual imposition of his minor daughter. The defendant was acquitted of the sexual imposition charges involving the employee. *Id.* at 53. The First District reversed the convictions for forcible rape of the adult daughter, holding that the state had not proved the defendant used force or threat of force, but affirmed the conviction for gross sexual imposition involving the minor daughter. *Id.* The defendant appealed his conviction for gross sexual imposition, claiming that the trial court had committed prejudicial error in refusing to grant his motion to sever the charges for trial, and the state cross-appealed the reversal of the rape convictions. *Id.* at 53-54.

{¶ 52} The Ohio Supreme Court affirmed the reversal of the defendant's conviction for forcible rape but reversed the defendant's conviction for gross sexual

imposition. The court remanded the case for a new trial on that count, concluding that the defendant had been prejudiced by the trial court's refusal to sever the charges. *Id.* at 63, 65. The court concluded that the defendant was prejudiced by the joinder of the offenses because the evidence presented on the gross sexual imposition charge was "at best thin" and "barely" sufficient to support a conviction for gross sexual imposition and joinder of the offenses "allowed the jury to consider significant amounts of other acts evidence that would not have been admissible if the charges had been severed for trial." *Id.* at 57, 62. The court noted that the testimony of defendant's employee would not have been admissible to prove that the defendant committed any offenses against his daughters and that although, "on the limited issue of the defendant's purpose," the adult daughter's testimony regarding the manner in which the defendant's backrubs led to sexual fondling would be relevant to prove that the defendant touched the minor's daughter's buttock for the purpose of sexual gratification "this testimony would not include [the adult daughter's] testimony concerning the remainder of her father's alleged sexual acts because the prejudicial value of the additional testimony would outweigh its probative value." *Id.* at 60-61.

{¶ 53} The court rejected the state's argument that the defendant was not prejudiced by joinder under the "simple and direct" test, noting that, in that case, the court of appeals had apparently confused the adult daughter and minor daughter's testimony when considering the sufficiency of the state's evidence on the gross sexual imposition charge. *Id.* at 62. The court stated: "We surely cannot

maintain the fiction that a jury was capable of segregating the evidence when three judges were not." *Id.* at 62-63. "Given the highly inflammatory nature of the offenses, the similarities between portions of the daughters' testimony, and the fact that joinder allowed the state to circumvent the prohibition on other acts testimony," the court concluded that "the defendant was prejudiced by the consolidated trial." *Id.* at 63. Once again, this is not that case.

### 5. Jackson Has Not Shown Plain Error

{¶ 54} Following a thorough review of the record, we find no plain error here. The offenses relating to the three incidents were charged together under Crim.R. 8(A) because they were of the "same or similar character" and were "based on two or more acts or transactions connected together" that were part of a "course of criminal conduct" occurring in close proximity, in or around the same geographic area, over a relatively short period of time. Jackson has not shown that the trial court's failure to, sua sponte, sever the offenses for trial constituted an obvious error or that there is a reasonable probability that any alleged error resulted in prejudice, affecting the outcome of the trial.

### a. Applying the Other-Acts Test and Simple and Direct Test

{¶ 55} First, we are not convinced that evidence of the other offenses would have been inadmissible other-acts evidence if the offenses related to each incident here had been tried separately. As detailed above, Jackson used A.A.'s vehicle, which he stole in the first incident, to facilitate his crimes against B.T. and N.D. in the second incident. Further, there were a number of striking similarities between

the manner in which the offenses in the three incidents were committed, suggestive of a modus operandi. Each incident occurred in the early morning hours, involving one or two vulnerable victims. In each incident, Jackson, wearing all black clothing, white shoes, a mask and gloves, approached the victims while they were in, or near, their vehicles, then drew a black firearm, demanded money and threatened the victims at gunpoint. In each incident, Jackson demanded that the victims remove their clothing and left the victims of the first and second incidents naked at the scene.

{¶ 56} In the second and third incidents (where the victims had bank cards), he forced the victims drive to various ATMs to withdraw money and give it to him. As he drove with his victims, Jackson demonstrated his willingness to use his firearm by firing it from inside the vehicle (out an open window in the second incident and out the sunroof in the third incident) before directing the victims to a secluded area where he raped them. After he was finished with B.T. and N.D., he set fire to N.D.'s car. And when A.A.'s car was recovered, it was discovered that it, too, had been set on fire. "To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and share common features with the crime in question." (Emphasis deleted.) *State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616 (1994), paragraph one of the syllabus. Although the crimes differed in certain respects, "[a]dmissibility is not adversely affected simply because the other [crimes] differed in some details." *State v. Jamison*, 49 Ohio St.3d 182, 187, 552 N.E.2d 180 (1990). "Slight differences between the current and other acts will not

affect the admissibility of the other-acts evidence as long as it establishes 'a modus operandi identifiable with the defendant.'" (Emphasis deleted.) *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 119, quoting *Lowe* at 531.

{¶ 57} In addition, the kidnapping and rape offenses with which Jackson was charged were specific-intent crimes. As such, his intent was a material issue in the case. Because Jackson defended against the rape charges by claiming that the encounters had been consensual, i.e., that the women were "escorts" he had paid to have sex with him, he placed his intent at issue. Thus, even if the offenses had been tried separately, the evidence offered in support of the kidnapping and rape charges in the second incident would have arguably been admissible to rebut Jackson's claim of consent and prove his intent to engage in nonconsensual sex with K.C. in the third incident (and vice versa). *Cf. State v. N.S.*, 10th Dist. Franklin Nos. 20AP-66 and 20AP-67, 2020-Ohio-5318, ¶ 34-37 (trial court did not abuse its discretion when it joined the two indictments for trial over defendant's objection because the proffered evidence in support of the rape and kidnapping convictions in the first indictment would be admissible, under Evid.R. 404(B), when offered to prove defendant's intent to engage in nonconsensual sex with the victim in the second indictment).

{¶ 58} Further, even if Evid.R. 404(B) would have precluded the admissibility of evidence of the other incidents if the charges had been tried separately, a defendant cannot show prejudice arising from the joinder of offenses if the evidence relevant to the charges in each case is simple and direct. When the evidence is "simple and direct," a defendant is not prejudiced by joinder regardless

of the nonadmissibility of evidence of the crimes as other-acts evidence under Evid.R. 404(B). *Lott*, 51 Ohio St.3d at 163-164, 555 N.E.2d 293; *Miller*, 2023-Ohio-1141, at ¶ 80.

{¶ 59} Although the crimes committed during the three incidents at issue were similar in type and character, they were distinct in proof. The crimes were committed on different dates, at different locations and involved different victims. A.A., B.T., N.D. and K.C. each provided detailed testimony regarding the specific crimes of which they were the victims. The state also presented surveillance video footage capturing portions of the incidents and extensive testimony from police officers, detectives, medical professionals and forensic scientists detailing the investigation, evidence collection and forensic analysis performed related to each incident. Although several of the state's witnesses were involved in the investigation of multiple incidents, these witnesses testified regarding the evidence relating to each incident and victim separately, clearly, succinctly, in a straightforward manner and without significant overlap or conflation of proof. Although the witnesses' discussion of the DNA evidence may have appeared complicated due to the scientific testing involved, the application of that evidence was simple and direct. *See Echols*, 2015-Ohio-5138, at ¶ 19 ("[DNA] evidence, although scientific in nature and presented through expert testimony, is simple in its application."). "A trier of fact is believed capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated." *State v. Lunder*, 8th Dist. Cuyahoga No. 101223, 2014-Ohio-5341, ¶ 33.

{¶ 60} There is nothing to indicate that the jury was incapable of separating the evidence as to each victim here. Joinder is not prejudicial where "the evidence is direct and uncomplicated and can reasonably be separated as to each offense." *Id.* Although Jackson asserts "'the fact-finder would have had a very difficult time looking at the evidence supporting each offense as simple and distinct because the temptation would be too great to respond to the evidence emotionally rather than rationally,'" (Appellant's Br. at 12, quoting *Frazier*, 2004-Ohio-1121, at 18), he has not pointed to anything in the record to suggest that the jury here was confused by the evidence, "respond[ed] to the evidence emotionally rather than rationally" or was otherwise improperly influenced by the cumulative effect of the joinder. *See* App.R. 16(A)(7) ("The appellant shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, *with citations to the authorities, statutes, and parts of the record* on which appellant relies.") (Emphasis added.) Prejudice cannot be presumed merely because the jury heard evidence of a defendant's commission of separate crimes. *Williams*, 2024-Ohio-337, at ¶ 18. Further, the jury was specifically instructed:

> The charges set forth in each count in the indictment constitutes a separate and distinct matter. And you must consider each count and the evidence applicable to each count separately. And you must state your findings as to each count uninfluenced by your verdict as to any other count.
>
> The defendant may be found guilty or not guilty of any one or all of the offenses charged.

We presume the jury followed the trial court's instructions. *McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 226; *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995).

### b. No Showing Any Error Affected the Outcome

{¶ 61} Even if the trial court should have severed the offenses for trial, we would still find no reversible error. To support a reversal based on plain error, Jackson needed to show not only that there was an obvious error but that "there is 'a reasonable probability that the error resulted in prejudice,'" i.e., that "the error affected the outcome of the trial." (Emphasis deleted). *McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, at ¶ 66, quoting *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 22. Jackson has not met his burden here.

{¶ 62} Although Jackson recites the plain error standard of review in his appellate briefs, he does not actually apply that standard of review when making his argument in support of his first assignment of error. Jackson argues only that the trial court erred in failing to sever the charges. He has not argued — must less shown — that a reasonable probability exists that the failure to sever the charges affected the outcome of this case. (Appellant's Br. at 7-11, 15; Reply Br. at 3-5.)

{¶ 63} As detailed above, the state presented substantial, if not overwhelming, evidence supporting Jackson's convictions. The victims' testimonies were credible and compelling. Jackson's testimony was not. Portions of the incidents were captured on surveillance video footage that was shown to the jury. B.T. and K.C. identified Jackson in court as the man who had stolen from them,

kidnapped them, threatened them and raped them at gunpoint. DNA evidence from items recovered from A.A.'s car and from B.T. and K.C.'s sexual assault examination kits linked Jackson to the incidents and crimes at issue and corroborated B.T. and K.C.'s testimonies that Jackson was their perpetrator. Jackson does not contend that any of his convictions were not supported by sufficient evidence or were against the manifest weight of the evidence. The record reveals no confusion on the part of the jury as to which charges the evidence was offered to prove.

{¶ 64} After careful consideration, we find no plain error here. This is not the "'exceptional'" case in which reversal is necessary to correct a plain error "'to prevent a manifest miscarriage of justice.'" *Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240, quoting *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus; *see also Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, at ¶ 74 (no plain error where joinder of counts was "not erroneous on its face at the outset of trial" and "even if it had been, given the substantial evidence of [the defendant's] guilt, the alleged error was not outcome determinative").

{¶ 65} Jackson's first assignment of error is overruled.

## B. Ineffective Assistance of Counsel

{¶ 66} In his second assignment of error, Jackson contends that he was denied the effective assistance of counsel in violation of his rights under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio

Constitution based on trial counsel's failure to request severance of the charges under Crim.R. 14.[3]

{¶ 67} A criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As a general matter, to establish ineffective assistance of counsel, a defendant must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the defendant, i.e., a reasonable probability that but for counsel's errors, the outcome of the proceeding would have been different. *Id.* at 687-688, 694; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 68} In Ohio, a properly licensed attorney is presumed to be competent. *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 35 (8th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Because there are "countless ways to provide effective assistance in any given case," a court must give great

---

[3] Although Jackson asserts that his constitutional right to counsel under both the United States and Ohio Constitutions was violated, because Jackson does not claim that he was entitled to greater protection or was afforded broader rights under the Ohio Constitution, and because Ohio courts generally evaluate ineffective assistance claims under the same standards that federal courts use, *see, e.g., State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 17 N.E.3d 754, ¶ 95; *State v. Wright*, 2d Dist. Miami No. 2022-CA-27, 2023-Ohio-2895, ¶ 18, we do not separately analyze Jackson's rights under the United States and Ohio Constitutions here.

deference to counsel's performance and "indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689; *see also State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"), quoting *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

{¶ 69} Jackson asserts that "[g]iven the highly inflammatory nature of the offenses, the similarities between parts of the victims' testimony, and the fact that joinder allowed the State to circumvent the prohibition of other acts testimony," trial counsel's failure to request severance was objectively unreasonable and that "if not for [the] trial counsel's failure to request severance, there was a reasonable probability that the proceeding would have been different, sufficient to undermine confidence in the outcome." We disagree.

{¶ 70} Jackson has not shown that defense counsel rendered ineffective assistance of counsel by failing to request severance here. For the reasons stated above, Jackson has not shown that a motion to sever, if filed, would have been successful. Trial counsel cannot be deemed deficient or ineffective for failing to perform a futile act. *State v. Washington*, 2023-Ohio-1667, 214 N.E.3d 1188, ¶ 145 (8th Dist.), citing *State v. May*, 2015-Ohio-4275, 49 N.E.3d 736, ¶ 35 (8th Dist.); *State v. Witherspoon*, 8th Dist. Cuyahoga No. 94475, 2011-Ohio-704, ¶ 33 ("[T]he failure to do a futile act cannot be the basis for claims of ineffective assistance of

counsel and is not prejudicial.").  Additionally, Jackson has not shown that he was prejudiced by the joinder of the offenses at issue.  Based on the record before us, we cannot say that there is a reasonable probability that the outcome of Jackson's trial would have been different if his trial counsel had requested severance.  Accordingly, we overrule Jackson's second assignment of error.

### C.  Imposing Sentences on Firearm Specifications Attached to Having Weapons While Under Disability Charges

{¶ 71} In his third assignment of error, Jackson contends that the trial court erred in imposing sentences on the firearm specifications attached to the three having weapons while under disability charges of which he was convicted.

{¶ 72} Jackson was found guilty of three counts of having weapons while under disability in violation of R.C. 2923.13(A)(2).  The trial court sentenced Jackson, on each of these counts, to a 36-month prison term on the underlying offense and a 54-month prison term on the firearm specification.  Jackson did not object to the trial court's imposition of sentences on the firearm specifications below.

{¶ 73} R.C. 2929.14(B)(1)(e) states that a prison term for a firearm specification shall not be imposed upon an offender for a violation of R.C. 2923.13 unless two requirements are met:  (i) the offender has previously been convicted of aggravated murder, murder or any first- or second-degree felony and (ii) "[l]ess than five years have passed since the offender was released from prison or post-release control, whichever is later, for the prior offense."  *See also State v. Gray*, 4th Dist. Washington No. 21CA6, 2022-Ohio-2940, ¶ 23 ("R.C. 2929.14(B)(1)(e) * * *

provides that the offense of having a weapon while under a disability is not enhanceable with a sentence from a firearm specification 'unless the offender previously has been convicted of aggravated murder, murder, or any first or second degree felony, and less than five years have passed since the offender was released from prison or post-release control, whichever is later, for the prior offense.'"), quoting *State v. Ellis*, 6th Dist. Wood Nos. WD-17-035 and WD-17-036, 2019-Ohio-427, ¶ 14.

{¶ 74} In this case, the parties stipulated to the admissibility of the final judgment entry related to Jackson's prior conviction in Cuyahoga C.P. No. CR-08-517051 ("517051") for aggravated robbery, a first-degree felony. The judgment entry indicates that on January 21, 2009, Jackson was sentenced to five years in prison (one year on a firearm specification to be served prior to and consecutive to four years on the underlying offense) and five years of postrelease control. No evidence was presented as to when Jackson was released from prison or postrelease control for that offense.

{¶ 75} Jackson argues that because the state failed to present evidence of the date he completed his prison sentence and postrelease control in case number 517051, the state "failed to demonstrate that less than five years had passed since [Jackson] was released from prison or post-release control" for that offense under R.C. 2929.14(B)(1)(e)(ii) and the sentences imposed on the firearm specifications associated with the having weapons under disability charges were, therefore, "unlawful" and "should be reversed."

{¶ 76} Jackson failed to raise this issue in the trial court. Accordingly, our appellate review is, once again, limited to plain error. *State v. Wiley*, 8th Dist. Cuyahoga No. 107417, 2019-Ohio-3092, ¶ 19; *State v. Stewart*, 10th Dist. Franklin No. 18AP-496, 2020-Ohio-1245, ¶ 7. As stated above, reversal for plain error requires a showing that there was an error, that the error was obvious and that "there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis deleted). *McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, at ¶ 66, quoting *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 22. The party asserting plain error bears the burden of demonstrating plain error on the record. *Rogers* at ¶ 22.

{¶ 77} Jackson has failed to show that the court committed plain error in sentencing him. Jackson points to no evidence in the record that shows that the requirements of R.C. 2929.14(B)(1)(e) were not met here. *Wiley* at ¶ 22; *State v. Woods*, 8th Dist. Cuyahoga No. 106476, 2018-Ohio-4856, ¶ 19 (finding that "[w]ithout sufficient evidence of [the R.C. 2929.14(B)(1)(e)] factors, [the defendant] cannot show that the outcome of his sentence would have been different").

{¶ 78} Jackson admits that he was previously convicted of aggravated robbery, a first-degree felony, in 517051. This satisfies the first requirement of the statute, R.C. 2929.14(B)(1)(e)(i). With respect to the second requirement of the statute, R.C. 2929.14(B)(1)(e)(ii), the offenses at issue were committed from May 24, 2022 to July 28, 2022. The judgment entry in 517051 reflects that on January 21, 2009, Jackson was sentenced to five years in prison to be followed by

five years of postrelease control. The trial court's docket in 517051, of which we take judicial notice, further shows that on September 12, 2012, Jackson was granted 95 days of jail-time credit and that on December 28, 2012, the trial court denied his motion for judicial release. From these facts, it could be reasonably inferred that "less than five years had passed since [Jackson] was released from prison or post-release control, whichever is later, for the prior offense," thereby satisfying the second requirement under R.C. 2929.14(B)(1)(e)(ii). Jackson has pointed to no evidence in the record to the contrary.

{¶ 79} We find no plain error in the trial court's imposition of prison sentences on the firearm specifications associated with Jackson's convictions for having weapons while under disability. Jackson's third assignment of error is overruled.

{¶ 80} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds that there were reasonable grounds for these appeals.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., CONCURS;
MICHAEL JOHN RYAN, J., CONCURS IN PART AND DISSENTS IN PART (WITH SEPARATE OPINION)

MICHAEL JOHN RYAN, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 81} I concur with the majority's resolution of the first and second assignments of error, but I respectfully dissent as to its resolution of the third assignment of error. In his third assignment of error, Jackson contends that the imposition of a sentence for the firearm specifications attendant to the convictions for having weapons while under disability was unlawful. I believe on the record presented in this case he is correct.

{¶ 82} As the majority correctly notes, a prison term for a firearm specification "shall not" be imposed upon an offender for a having weapons while under disability conviction "unless" "[t]he offender previously has been convicted of aggravated murder, murder, or any felony of the first or second degree" *and* "[l]ess than five years have passed since the offender was released from prison or post-release control, whichever is later, for the prior offense." R.C. 2929.14(B)(1)(e).

{¶ 83} In my view, the record in this case only established the first requirement under R.C. 2929.14(B)(1), that is, that Jackson had the requisite prior conviction. Specifically, the parties stipulated to Jackson's prior conviction for aggravated robbery, a felony of the first degree, which was rendered in Cuyahoga C.P. No. CR-08-517051.

{¶ 84} In regard to the second portion of the statutory requirement, despite the majority acknowledging that "[n]o evidence was presented as to when Jackson was released from prison or postrelease control for that offense," it finds, after taking judicial notice of the docket from Jackson's prior case, that it "could be reasonably inferred" that the second portion of the statute was met. Majority opinion at ¶ 74, 78.

{¶ 85} I realize we are conducting a plain-error review of this issue, but even under that standard, I would find that the second requirement under R.C. 2929.14(B)(1)(e) was not met. Further, I am aware of this court's decision in *State v. Woods*, 8th Dist. Cuyahoga No. 106476, 2018-Ohio-4856, and believe it was wrongly decided.

{¶ 86} *Woods*, too, reviewed this issue for plain error. In *Woods*, there was "*no evidence in the record* regarding whether [the defendant] was previously convicted of aggravated murder, murder, or any first- or second-degree felony." (Emphasis added.) *Id.* at ¶ 19. Further, there was "*no evidence in the record* regarding how many years have passed since [the defendant] was released from prison or postrelease control." (Emphasis added.) *Id.* The *Woods* panel concluded

that "without sufficient evidence of these two factors, [the defendant] cannot show that the outcome of his sentence would have been different." *Id.* I believe the *Woods* court placed an improper burden on the defendant — that is, to prove a negative. *See State v. Wiley*, 8th Dist. Cuyahoga No. 107417, 2019-Ohio-3092, ¶ 37 (E.A. Gallagher, J., dissenting). It was the state that sought the sentencing enhancement, and the state should have demonstrated that it applied. Likewise, here, it was the state's responsibility to make sure Jackson qualified for the enhancement, and I would decline to make a possible reasonable inference, even under a plain-error-standard of review, to find that it fulfilled its obligation.

{¶ 87} I would follow the dissent on this issue in *Wiley*, which was released subsequent to *Woods*. In *Wiley*, under review for plain error, the dissent disagreed with the analysis on this issue as set forth in *Woods*, stating that, because R.C. 2929.14(B)(1)(e) makes it "abundantly clear that a court 'shall not impose' a prison term 'unless' both subdivisions apply," she believed that the defendant's sentence on the offending charge and specification should have been vacated and the case remanded for the limited purpose of determining whether the statute applied. *Wiley* at ¶ 37-38 (E.A. Gallagher, J., dissenting).

{¶ 88} On the record before us, I respectfully dissent as to the majority's resolution of the third assignment of error. I concur with the remainder of the opinion.